1
2025 CO 25 The People of the State of Colorado, Plaintiff-Appellant v. Oscar Jonas Ganaway. Defendant-Appellee No. 24SA244Supreme Court of Colorado, En BancMay 27, 2025

         
Interlocutory Appeal from the District Court Arapahoe County
District Court Case No. 22CR505 Honorable David N. Karpel,
Judge

         
ORDER

         
Attorneys for Plaintiff-Appellant: John Kellner, District
Attorney, Eighteenth Judicial District L. Andrew Cooper,
Deputy District Attorney Centennial, Colorado

         
Attorneys for Defendant-Appellee: Law Firm of Heather Little,
LLC Heather Little Durango, Colorado

         
JUSTICE BOATRIGHT delivered the Opinion of the Court, in
which CHIEF JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE
HART, and JUSTICE SAMOUR joined. JUSTICE BERKENKOTTER, joined
by JUSTICE GABRIEL, dissented.

2

         
OPINION

         
BOATRIGHT, JUSTICE.

         ¶1
While conducting an operation to arrest Anthony Veloz at a
motel, the police encountered Oscar Jonas Ganaway walking
toward the motel. An officer asked Ganaway where he was
going, and Ganaway pointed to Veloz's motel room. A
detective then asked Ganaway if he could pat him down for
weapons, and Ganaway said, "No problem." During the
patdown, the detective found methamphetamine and arrested
Ganaway. Ganaway later moved to suppress the seized evidence.
The trial court granted the motion, finding that the initial
encounter was a seizure, and therefore, the evidence arising
from the search must be suppressed. The People appealed the
trial court's order under section 16-12-102(2), C.R.S.
(2024), and C.A.R. 4.1.

         ¶2
We now hold, based on the totality of the circumstances, that
the initial encounter between the police and Ganaway was not
a seizure, meaning it did not trigger Fourth Amendment
protections. We further hold that Ganaway voluntarily
consented to the patdown. Accordingly, we reverse the trial
court's suppression order and remand the case for further
proceedings consistent with this opinion.

         I.
Facts and Procedural History

         ¶3
Uncontroverted testimony at the suppression hearing
established the following facts.

3

         ¶4
The Denver Police Department ("DPD") suspected
Veloz of supplying drugs that had been smuggled into the
Denver City Jail. Veloz's parole officer, Officer
DeHerrera, knew that Veloz was staying at a motel in
Glendale, Colorado. On the way to the motel to execute an
arrest warrant, DPD Detective Foster called the Glendale
Police Department ("GPD") investigations unit to
ask for assistance. Ultimately, a group of seven or eight
officers gathered at the motel: Officer DeHerrera, two DPD
detectives, and four or five GPD detectives.[1] They all wore
badges and plain clothes under tactical, ballistic vests with
conspicuous lettering that read "POLICE." They also
carried firearms that were covered by their clothing.

         ¶5
The group gathered out of sight from Veloz's room, on the
south side of the motel parking lot. The plan was for Officer
DeHerrera to knock on the door to Veloz's room from the
exterior of the building, as the motel rooms are all
accessible via outdoor hallways, or "breezeways."
As the police were approaching the building, walking toward
the breezeway, Ganaway parked his Hyundai about sixty feet in
front of them, exited the car, and began walking toward them.
The police stopped moving.

4

         ¶6
Ganaway continued walking toward the group. He was looking
down at the ground and not paying attention to his
surroundings. When Ganaway was about twenty feet away,
Officer DeHerrera asked him where he was going. Ganaway
pointed to Veloz's room. He appeared shocked to see the
police and began clutching the pockets of his pants and
sweatshirt. There seemed to be a large object weighing down
his sweatshirt pocket.

         ¶7
Concerned that Ganaway was armed, Detective Foster said to
Ganaway (who was still about twenty feet from the group),
"I'd like to pat you down for weapons, if that's
okay." Ganaway responded, "no problem"; he put
his hands out to the side, turned around, and walked
backwards toward Detective Foster. No one requested or
commanded Ganaway to approach in that manner. The officers
remained in place in a line, which Detective Foster stepped
out of, though he did not advance toward Ganaway. Ganaway
continued walking backwards until Detective Foster said,
"That's good," at which point the two of them
were about a foot apart from each other.

         ¶8
Preparing to conduct the patdown, Detective Foster visually
scanned Ganaway's body. Ganaway's sweatpants pockets
were hanging open, and Detective Foster saw a plastic bag
protruding out of his pocket; the bag contained
semi-translucent crystalline shards of what he suspected to
be methamphetamine. Detective Foster proceeded with the
patdown, and as he ran his hand over the

5

pocket containing the plastic bag, he felt a crunch, which
based on his experience as a police officer, he identified as
consistent with the texture of methamphetamine shards.
Ganaway did not possess a weapon on his person. Detective
Foster took the plastic bag for evidence and arrested
Ganaway. Detective Foster then passed Ganaway to Detective
Traudt and other GPD personnel.

         ¶9
Detective Traudt searched Ganaway incident to his arrest,
locating a Hyundai key fob. Detective Traudt advised Ganaway
of his Miranda rights. Ganaway stated that he
understood those rights and wanted to talk. Ganaway explained
that he had been previously convicted of drug felonies which
resulted in him serving a few years in prison. Detective
Traudt asked whether Ganaway had any firearms on him or in
his car. Ganaway responded that he had a firearm in his car
and that he knew he was not supposed to possess a gun but did
so for his personal safety. Detective Gonzalez asked Ganaway
if they could search his car, and Ganaway consented. The
police subsequently searched the car and discovered the
firearm that Ganaway had mentioned.

         ¶10
The People charged Ganaway with unlawful possession of a
controlled substance, § 18-18-403.5, C.R.S. (2024),
possession of a weapon by a previous offender, §
18-12-108, C.R.S. (2024), and a special offender count,
§ 18-18-407, C.R.S. (2024). Ganaway moved to suppress
his statements and the evidence.

6

         ¶11
At the suppression hearing, the trial court made factual
findings consistent with the testimony of Detectives Foster
and Traudt. The court, however, made two additional critical
findings of fact, which it used to support its legal
conclusions: (1) "the officers surrounded
[Ganaway]" in tactical gear and altered his direction of
travel when he arrived near Veloz's door; and (2) the
officers asked Ganaway to "come with us . . . and
describe where you [are] going" when he pointed to
Veloz's door.

         ¶12
The court then found that the record "does not support
an existence of a consensual encounter." It further
found that the officers lacked reasonable articulable
suspicion that Ganaway was committing or about to commit a
crime. Consequently, it granted Ganaway's motions to
suppress. The People filed this interlocutory
appeal.[2]

         II.
Analysis

         ¶13
The People argue that (1) Ganaway's initial encounter
with the police was not a Fourth Amendment
"seizure," and (2) Detective Foster's patdown
search was permissible because Ganaway voluntarily consented
to it. To resolve these issues, we begin by identifying the
applicable standard of review. Next, we

7

analyze whether either Officer DeHerrera's initial
question to Ganaway, or Detective Foster's subsequent
patdown, violated Ganaway's Fourth Amendment rights. We
hold, based on the totality of the circumstances, that the
initial encounter between the police and Ganaway was not a
seizure, meaning it did not trigger Fourth Amendment
protections. We further hold that Ganaway voluntarily
consented to the patdown. Accordingly, we reverse the trial
court's suppression order and remand the case for further
proceedings consistent with this opinion.

         A.
Standard of Review

         ¶14
A trial court's order regarding a motion to suppress
presents a "mixed question of fact and law."
People v. Dacus, 2024 CO 51, ¶ 23, 559 P.3d
198, 203. We defer to "the trial court's findings of
historical fact . . . if they are supported by competent
evidence in the record." People v. McDaniel,
160 P.3d 247, 250 (Colo. 2007) (quoting People v.
McClain, 149 P.3d 787, 789 (Colo. 2007)). If the trial
court's factual findings are "so clearly erroneous
as not to find support in the record," they must be set
aside. People v. Schrader, 898 P.2d 33, 36 (Colo.
1995) (quoting People v. Johnson, 653 P.2d 737, 740
(Colo. 1982)). Thus, a trial court's ultimate legal
conclusion that is "unsupported by evidentiary findings
is subject to correction on review." People v.
Miranda-Olivas, 41 P.3d 658, 661 (Colo. 2001) (citing
People v. Gennings, 808 P.2d 839, 847 (Colo. 1991)
(reversing a suppression order because

8

the trial court's findings were "not adequately
supported in the record")). In reviewing a trial
court's ruling on a motion to suppress, "we look
solely to the record created at the suppression
hearing." People v. Thompson, 2021 CO 15,
¶ 16, 500 P.3d 1075, 1078.

         B.
Fourth Amendment Seizures

         ¶15
The Fourth Amendment of the Constitution protects citizens
from unreasonable searches and seizures. U.S. Const. amend.
IV. "When the police 'seize' a citizen, they
must comply with those protections. Not every interaction
with the police, however, is a seizure." People v.
Taylor, 2018 CO 35, ¶ 8, 415 P.3d 821, 824. Arrests
and investigatory stops are seizures and therefore implicate
the Fourth Amendment. People v. Brown, 2022 CO 11,
¶ 15, 504 P.3d 970, 975. However, "[c]onsensual
encounters are not seizures . . . and do not implicate the
Fourth Amendment." Taylor, ¶ 8, 415 P.3d
at 824 (alteration and omission in original) (quoting
People v. Marujo, 192 P.3d 1003, 1006 (Colo. 2008)).

         1.
Defining a Seizure

         ¶16
"A consensual encounter is one 'in which no
restraint of the liberty of the citizen is implicated, but
the voluntary cooperation of the citizen is elicited through
non-coercive questioning.'" People v.
Walters, 249 P.3d 805, 809 (Colo. 2011) (quoting
People v. Johnson, 865 P.2d 836, 842 (Colo. 1994)).
A seizure requires "either physical force . . . or,
where that is absent, submission to the assertion of

9

authority." McClain, 149 P.3d at 789-90
(omission in original) (quoting California v. Hodari
D., 499 U.S. 621, 626 (1991)).

         ¶17
Ultimately, in deciding whether an encounter with the police
is consensual rather than a seizure, courts "must
consider whether 'a reasonable person would feel free to
decline the officers' requests or otherwise terminate the
encounter.'" Marujo, 192 P.3d at 1006
(quoting Florida v. Bostick, 501 U.S. 429, 436
(1991)). "This test presupposes an innocent
person." Id. "While most citizens will
respond to a police request, the fact that people do so, and
do so without being told they are free not to respond, hardly
eliminates the consensual nature of the response."
People v. Paynter, 955 P.2d 68, 72 (Colo. 1998)
(quoting INS v. Delgado, 466 U.S. 210, 216 (1984)).
While the test considers the totality of the circumstances,
"[t]he subjective intent of the officer in initiating
the encounter is not relevant for Fourth Amendment
purposes." Marujo, 192 P.3d at 1006 (citing
Whren v. United States, 517 U.S. 806, 813-14
(1996)).

         ¶18
"Police officers do not implicate the protections
afforded by the Fourth Amendment by merely asking an
individual questions, even when those questions might pertain
to criminal conduct." Taylor, ¶ 9, 415
P.3d at 824. If the person being questioned is "free to
disregard the questions and walk away, there has been no
intrusion upon that person's liberty or privacy as would
under the Constitution require some particularized and
objective justification." Id.

10

(quoting United States v. Mendenhall, 446 U.S. 544,
554 (1980)). "While a citizen may feel instinctive
pressure to cooperate with police officers, without an
additional display of force or authority by the officer, this
pressure does not suffice to transform a consensual encounter
into a seizure." Marujo, 192 P.3d at 1008. The
encounter only escalates to a seizure if the obligation to
comply is "greater than the obligation an innocent
citizen would normally feel to cooperate with the
police." Id. at 1007.

         ¶19
Fourth Amendment reasonableness inquiries are objective and
fact specific. Paynter, 955 P.2d at 72-73 (relying
on Ohio v. Robinette, 519 U.S. 33, 39 (1996)). In
Marujo, we enumerated a nonexclusive list of factors
to consider when assessing whether "a reasonable,
innocent person would not feel free to decline the
officers' requests or otherwise terminate the
encounter." 192 P.3d at 1007 (quoting People v.
Jackson, 39 P.3d 1174, 1184 (Colo. 2002)). These factors
include:

(1) whether there is a display of authority or control over
the defendant by activating the siren or any patrol car
overhead lights;

(2) the number of officers present;

(3) whether the officer approaches in a non-threatening
manner;

(4) whether the officer displays a weapon;

(5) whether the officer requests or demands information;

(6) whether the officer's tone of voice is conversational
or whether it indicates that compliance with the request for
information might be compelled;

(7) whether the officer physically touches the person of the
citizen;

11

(8) whether an officer's show of authority or exercise of
control over an individual impedes that individual's
ability to terminate the encounter;

(9) the duration of the encounter; and

(10) whether the officer retains the citizen's
identification or travel documents.

Id. Rather than rely upon a single factor, the court
"must consider the totality of the circumstances to
determine whether the police exercised force or authority to
effect a stop, or whether the police merely sought the
voluntary cooperation of a citizen through a consensual
encounter." Paynter, 955 P.2d at 73.

         2.
Ganaway's Initial Encounter with Law Enforcement Was Not
a Seizure

         ¶20
Before analyzing the Marujo factors, we first note
that the trial court made two consequential factual findings
unsupported by the record (which consists solely of testimony
from Detective Foster and Detective Traudt at the suppression
hearing). The first finding was that "the officers
surrounded [Ganaway]" in tactical gear and altered his
direction of travel when he walked toward the motel. Although
both detectives testified to wearing tactical vests with
"POLICE" lettering, they did not mention any other
"tactical gear," such as helmets or long guns.
Additionally, Detective Foster testified that the police were
positioned in a line about twenty feet away from Ganaway when
the encounter began, and they

12

remained in that position as Ganaway continued to approach
them.[3] This uncontroverted testimony in no way
suggests that the police "surrounded" Ganaway. Nor
does it indicate that the police did anything to
"alter[]" Ganaway's "direction of
travel."

         ¶21
The second trial court finding was that the officers asked
Ganaway to "[c]ome with us . . . and describe where you
[are] going" when he pointed to Veloz's door. But
Detective Foster testified that Officer DeHerrera
"greeted [Ganaway] and asked where he was going";
again, this testimony was uncontroverted. Thus, contrary to
the court's finding, nothing in the record suggests that
the police told Ganaway to "[c]ome with us."

         ¶22
We conclude that these two factual findings lack competent
record support and are, therefore, clearly erroneous. Thus,
we set them aside for our analysis of the Marujo
factors, which we now examine.

         ¶23
(1) Use of sirens or lights: There was no "display of
authority or control over [Ganaway] by activating the siren
or any patrol car overhead lights." Marujo, 192
P.3d at 1007. Indeed, the police patrol cars were parked out
of sight so the police could arrive at Veloz's door
undetected.

13

         ¶24
(2) Number of officers: There were eight officers at the
scene. The presence of more than one officer can increase the
coerciveness of the interaction. However, "the presence
of multiple officers does not automatically mean that a stop
has occurred." United States v. Fields, 823
F.3d 20, 28 (1st Cir. 2016) (quoting United States v.
Goddard, 491 F.3d 457, 461 (D.C. Cir. 2007)).

         ¶25
(3) Manner of approach: The officers did not approach in a
threatening manner. In fact, they did not approach at all, as
Ganaway walked casually toward them. Indeed, Ganaway did not
notice the police presence until he was about twenty feet
away from them because he had been looking down at the ground
and not paying attention to his surroundings.

         ¶26
(4) Display of weapons: Each officer carried a concealed
firearm. However, the mere presence of firearms does not
indicate that the police approached in a threatening manner.
Paynter, 955 P.2d at 73 (describing an officer's
approach as nonthreatening when his gun was not displayed);
Marujo, 192 P.3d at 1008 (finding a consensual
encounter when the officer did not draw a weapon). Here, the
firearms were concealed and not drawn at any point during the
encounter. ¶27 (5) Request or demand for information:
Officer DeHerrera did not demand any information from
Ganaway. Instead, Officer DeHerrera simply asked a
question-where was he going. Questioning does not result in a
seizure "[u]nless the circumstances of the encounter are
so intimidating as to demonstrate that a

14

reasonable person would believe he is not free to
leave."[4] Paynter, 955 P.2d at 72; see,
e.g., State v. Ballinger, 366 P.3d 668, 672
(Mont. 2016) (finding that no seizure occurred when an
officer "intercepted" a couple walking toward a
house that he was investigating by asking them where they
were going).

         ¶28
(6) Officers' tone of voice: A tone "indicating that
compliance with the officer's request might be
compelled" may indicate a seizure. Mendenhall,
446 U.S. at 554. But here, the officers' tone was
friendly, not threatening.

         ¶29
(7) Physical contact: At this point, no one had physically
touched Ganaway, as he was about twenty feet away.

         ¶30
(8) Show of authority: A seizure does not occur unless a
reasonable person "would have perceived that the show of
authority was at least partly directed at him."
Brendlin v. California, 551 U.S. 249, 261 (2007);
see also Tate v. People, 2012 CO 75, ¶¶
7-9, 290 P.3d 1268, 1269-70; Lundstrom v. Romero,
616 F.3d 1108, 1122 (10th Cir. 2010) (finding that the police
had not seized a woman who stepped between her boyfriend and
an officer's pointed gun); United States v. Al
Nasser, 555 F.3d 722, 730-31 (9th Cir. 2009) (finding
that the police had not seized a motorist who pulled

15

over upon seeing a traffic stop of other motorists). Here,
the officers did not approach Ganaway-they were moving toward
Veloz's motel room when Ganaway walked into their
presence. A reasonable person in Ganaway's position would
have understood that police activity was afoot, but he would
not have perceived the officers' conduct to be directed
at him.

         ¶31
True, the police's tactical vests displaying
"POLICE" indicate authority. However, an encounter
does not become a seizure because of the "inherent
social pressure to cooperate with the police" or because
"the police do not inform the individual that he or she
is free to leave." People v. Melton, 910 P.2d
672, 676-77 (Colo. 1996) (citing Delgado, 466 U.S.
at 216). Yet, a defendant may be considered seized when they
cannot walk away from or around the officers. See
Brown, ¶¶ 20-22, 504 P.3d at 976-77
(discussing a nonconsensual encounter where patrol vehicles
blocked a defendant from exiting the parking lot in his
vehicle); but cf. Taylor, ¶ 12, 415 P.3d at 825
(finding that there was no seizure at the initial encounter
because there were "multiple avenues" for the
defendant to walk away from or around the officer); see
also People v. Shoen, 2017 CO 65, ¶ 13, 395 P.3d
327, 331 (assessing officers leaving exit paths open to the
defendant as a factor indicative of a consensual encounter).

         ¶32
Here, the police never ordered Ganaway to say or do anything.
The officers were facing Ganaway in a line as he approached
them. Unlike in Brown, ¶ 21,

16

504 P.3d at 976, where we noted that a patrol car physically
blocking the defendant's car from moving is indicative of
a nonconsensual encounter, there is no record of personnel or
patrol vehicles on either side of or behind Ganaway. Instead,
there was an unobstructed path for him to return to his car
and exit the motel parking lot.[5] Like in Taylor, ¶
12, 415 P.3d at 825, where there were many avenues to evade
the officer, there was nothing preventing Ganaway from
terminating the interaction with the police, as he could have
turned around and exited the motel parking lot by car or by
foot.[6] Further, the nature of the police presence
was such that Ganaway did not notice them until he was about
twenty feet away from them and Officer DeHerrera asked a
question. Thus, the police did not display force or authority
toward Ganaway that impeded his ability to terminate the
encounter.

         ¶33
(9) Duration of the encounter: The record does not establish
the precise length of Officer DeHerrera's interaction
with Ganaway. However, it was

17

apparently brief since Officer DeHerrera only asked one
question, and Ganaway simply pointed at Veloz's motel
room in response.

         ¶34
(10) Retention of identification: The police did not retain
Ganaway's identification, as they had not obtained it in
the first place.

         ¶35
In sum, although eight armed police officers wearing tactical
vests were twenty feet away from Ganaway, they never
threatened Ganaway nor displayed their weapons; they did not
demand information or compliance; and they did not touch or
surround him or otherwise exert their control. They simply
asked him one neutral question in a friendly tone, during a
brief interaction. Ganaway's personal reaction to the
police's presence is immaterial because the test of
"whether 'a reasonable person would feel free to
decline the officers' requests or otherwise terminate the
encounter' . . . presupposes an innocent person."
Marujo, 192 P.3d at 1006 (quoting Bostick,
501 U.S. at 436). Thus, we hold, based on the totality of the
circumstances, that the initial encounter between the police
and Ganaway was not a seizure, meaning it did not trigger
Fourth Amendment protections.

         C.
Consent to Search

         ¶36
We next consider whether Ganaway voluntarily consented to a
patdown in response to Detective Foster's statement,
"I'd like to pat you down for weapons, if

18

that's okay." We first analyze whether Ganaway's
actions indicated consent. Next, we determine whether that
consent was voluntary.

         1.
Defining Consent

         ¶37
Under the Fourth Amendment, "[a] warrantless search may
be justified and is constitutionally permissible when a
citizen consents to the search." People v.
Mendoza-Balderama, 981 P.2d 150, 156 (Colo. 1999).
Consent can be express or "implied through words,
actions, or both." People v. Berdahl, 2019 CO
29, ¶ 22, 440 P.3d 437, 442; see, e.g.,
Johnson, 865 P.2d at 845 (using the defendant's
actions as evidence of voluntary consent when no law
enforcement officers instructed him to act in the manner that
he did).

         ¶38
Voluntary consent requires "essentially free and
unconstrained choice by its maker." Schneckloth v.
Bustamonte, 412 U.S. 218, 225 (1973). Involuntary
consent is invalid. Id. at 233 (describing
involuntary consent as "coerced by threats or force, or
granted only in submission to a claim of lawful
authority"). "[T]he Fourth and Fourteenth
Amendments require that . . . consent not be coerced, by
explicit or implicit means, by implied threat or covert
force." Id. at 228. Promises or threats can
indicate coercive behavior. Johnson, 865 P.2d at
845.

         ¶39
To determine whether consent was voluntary, "courts must
apply an objective test that takes into account the totality
of the circumstances and determines whether the defendant
could reasonably have construed the police

19

conduct to be coercive." Berdahl, ¶ 23,
440 P.3d at 442. The test is "whether, under the
totality of the circumstances, the police's conduct
overbore the defendant's exercise of free will because it
was sufficiently coercive or deceptive to a person with his
characteristics in his circumstances." People v.
Munoz-Gutierrez, 2015 CO 9, ¶ 24, 342 P.3d 439,
445. To assess the totality of the circumstances, courts
evaluate: "the defendant's age, education, and
intelligence; the duration, location, and circumstances of
the search; the defendant's state of mind; and any other
factors that could have affected the defendant's free and
unconstrained choice in consenting to the search."
Berdahl, ¶ 23, 440 P.3d at 442. While we
consider whether a person knew they had a choice,
"consent can be voluntary even if the defendant did not
know that he or she was free to withhold consent."
Id. (first citing Schneckloth, 412 U.S. at
227; and then citing People v. Chavez-Barragan, 2016
CO 66, ¶ 38, 379 P.3d 330, 339).

         2.
Ganaway Voluntarily Consented to a Patdown

         ¶40
First, we review Ganaway's conduct during the encounter
with Detective Foster. Detective Foster said, "I'd
like to pat you down for weapons, if that's okay,"
to which Ganaway responded, "[N]o problem." Then,
unprompted, Ganaway "put his hands out to the side . . .
[and] turned around and backed up

20

towards [Detective Foster]."[7] After Ganaway began his
approach, Detective Foster stepped out of line with the
officers and waited for Ganaway to reach him. There was no
verbal exchange during Ganaway's approach. Once Ganaway
was about a foot away, Detective Foster said,
"That's good."

         ¶41
We conclude that these facts are sufficient to establish that
Ganaway consented to being searched by the police.
Ganaway's reply of "no problem" served as
express verbal consent; his subsequent walk toward Detective
Foster, which was not directed by the police, impliedly
reinforced this consent.

         ¶42
Second, we consider whether Ganaway's consent was
voluntary. We note that the police did not make any promises
or threats to Ganaway. On the contrary, the interaction had a
friendly tone. Further, Detective Foster's permissive
phrasing-" Id. like to pat you down for
weapons, if that's okay"-evinces a request
rather than an authoritative command. See People v.
Thomas, 839 P.2d 1174, 1176-78 (Colo. 1992) (concluding
that the defendant's consent was voluntary where the
officer asked "if it was okay to pat him down");
see also Marujo, 192 P.3d at 1005, 1008 (concluding
that the defendant's consent was voluntary where the
officer asked, "[W]ould you mind stepping over here? . .
. Would you mind if I patted you down to check for
weapons?"); United States v. Drayton, 536 U.S.
194, 206-07 (2002)

21

(interpreting "Mind if I check you?" as a request
for consent). Thus, to the extent that Ganaway may have felt
Detective Foster's request to pat him down was a demand,
the police's conduct did not cause that perception.

         ¶43
Nor does the record otherwise indicate that Ganaway's
consent could have been the product of duress, coercion,
deception, or undue influence. The encounter was brief,
consisting of two succinct questions.

         ¶44
Moreover, there is no evidence in the record that
Ganaway's age, education, intelligence, or state of mind
prevented him from voluntarily consenting. True, Ganaway did
have prior contact with law enforcement, but such experience
does not transform a request into a command. Further, while
Detective Foster did not expressly advise Ganaway of his
right to refuse consent, that does not render Ganaway's
consent involuntary. Accordingly, from the perspective of a
reasonable person in Ganaway's position, the police's
conduct did not overbear Ganaway's exercise of free will.

         ¶45
For these reasons, we hold that Ganaway voluntarily consented
to the patdown.

         III.
Conclusion

         ¶46
For the foregoing reasons, we reverse the trial court's
suppression order and remand the case for further proceedings
consistent with this opinion.

         
JUSTICE BERKENKOTTER, joined by JUSTICE GABRIEL, dissented.

22

         
JUSTICE BERKENKOTTER, joined by JUSTICE GABRIEL, dissenting.

         ¶47
Oscar Jonas Ganaway was walking from his car to room 145 of
the HomeTowne Studios motel when he heard someone ask where
he was going. He looked up and was shocked to see eight
officers, barely twenty feet away, wearing identical tactical
vests conspicuously labeled "POLICE." They were
standing in a single line against the motel's outer wall
roughly six to ten feet from Ganaway's intended
destination. No one else was around, and it appeared that the
officers, one of whom immediately asked to pat him down, were
engaged in some type of tactical operation. The majority
concludes that a reasonable person in Ganaway's position
would have believed that they were free to decline the
patdown request and continue on. I disagree, and thus I
respectfully dissent.

         ¶48
In reversing the district court's suppression ruling, the
majority concludes that (1) the "initial" encounter
between the police and Ganaway was not a seizure and (2)
Ganaway voluntarily consented to the patdown search. I
believe that by treating the encounter as consisting of two
distinct parts, the majority fails to adequately consider the
totality of the circumstances surrounding the encounter.
People v. Jackson, 39 P.3d 1174, 1182 (Colo. 2002),
abrogated on other grounds by Brendlin v.
California, 551 U.S. 249 (2007). I also disagree with
the majority's conclusions that the encounter between
Ganaway and the eight officers was

23

consensual and that the district court erred in granting
Ganaway's motion to suppress the evidence seized.

         ¶49
Because the officers lacked reasonable suspicion to seize
Ganaway, I would affirm the district court's suppression
order.

         I.
Legal Authority

         ¶50
The Fourth Amendment of the United States Constitution
protects citizens from unreasonable government searches and
seizures. U.S. Const. amend. IV. The law recognizes three
categories of police-citizen encounters: (1) arrests, (2)
investigatory stops, and (3) consensual interviews.
People v. Paynter, 955 P.2d 68, 72 (Colo. 1998).
Because arrests and investigatory stops are seizures, they
implicate the Fourth Amendment. People v. Morales,
935 P.2d 936, 939 (Colo. 1997). They must therefore be
justified by probable cause and reasonable suspicion,
respectively. Jackson, 39 P.3d at 1179.

         ¶51
Consensual encounters, in contrast, are "requests for
cooperation" that do not implicate the Fourth Amendment.
Id.; see also Florida v. Bostick, 501 U.S.
429, 434 (1991) (stating that an "encounter will not
trigger Fourth Amendment scrutiny unless it loses its
consensual nature"). "Thus, the boundary between
consensual encounters and investigatory stops is crucial
because it defines where the protection of the Fourth
Amendment begins." Jackson, 39 P.3d at 1179.

24

         ¶52
To determine whether an encounter is consensual, "the
crucial test is whether, taking into account all of the
circumstances surrounding the encounter, the police conduct
would 'have communicated to a reasonable person that he
was not at liberty to ignore the police presence and go about
his business.'" Bostick, 501 U.S. at 437
(quoting Michigan v. Chesternut, 486 U.S. 567, 569
(1988)). The test "is necessarily imprecise, because it
is designed to assess the coercive effect of police conduct,
taken as a whole, rather than to focus on particular details
of that conduct in isolation." Chesternut, 486
U.S. at 573.

         ¶53
"The message that a suspect is not free to leave or
terminate the inquiry can be conveyed, not necessarily
intentionally, in ways less obvious than actual physical
force or explicit command." Jones v. United
States, 154 A.3d 591, 595 (D.C. 2017). Consequently,
this analysis "requires an examination of the behavior
of the parties, as well as the physical, temporal, and social
context of the encounter." Outlaw v. People, 17
P.3d 150, 156 (Colo. 2001). It also employs an objective
standard, "looking to the reasonable [person's]
interpretation of the conduct in question."
Chesternut, 486 U.S. at 574. Because the test
focuses on what a reasonable person would understand,
"the subjective intent of the officers is relevant . . .
only to the extent that that intent has been conveyed to the
person confronted." Id. at 575 n.7.

25

         II.
Analysis

         A.
This Was a Single Encounter

         ¶54
The majority analyzes the encounter between Ganaway and the
police as if it consisted of two distinct encounters. It
concludes that the "initial encounter," when the
police first stopped Ganaway to ask where he was going, was
not a seizure. Maj. op. ¶ 35. It then separately
considers whether Ganaway voluntarily consented to be patted
down for weapons. This approach, in my view, is at odds with
our long-standing jurisprudence requiring us to examine the
totality of the circumstances a person faces when interacting
with the police. See, e.g., People v.
Marujo, 192 P.3d 1003, 1004, 1007-08 (Colo. 2008)
(treating the initial stop of a suspect and the officer's
patdown request as a single encounter for purposes of
determining whether the encounter was consensual).

         ¶55
By bifurcating the event and also its analysis in this
manner, the majority disregards the rest of the encounter
between Ganaway and the officers in evaluating whether this
short but charged encounter was consensual. Notably, the
majority excludes from its consideration the circumstances
surrounding Detective Foster's "request" to pat
Ganaway down immediately after they stopped him a mere ten
feet from his intended destination.

26

         ¶56
In my view, this was a single encounter in which Ganaway was
stopped and searched by the police without reasonable
suspicion because he was in the wrong place at the wrong
time. This was a seizure.

         B.
The Totality of the Circumstances Surrounding the Encounter
Indicates a Seizure

         ¶57
We have identified several factors to aid in determining
whether "a reasonable, innocent person would not feel
free to decline the officers' requests or otherwise
terminate the encounter." Marujo, 192 P.3d at
1007 (quoting Jackson, 39 P.3d at 1184). These
factors are neither exhaustive nor exclusive. Id.
"Words and actions can reasonably be perceived
differently depending on the surroundings, which provide
important context." Dozier v. United States,
220 A.3d 933, 947 (D.C. 2019). This is one of the reasons why
we have repeatedly emphasized that the "totality of the
circumstances analysis requires an examination of the
behavior of the parties, as well as the physical, temporal,
and social context of the encounter." Outlaw,
17 P.3d at 156; see also Chesternut, 486 U.S. at 573
(stating that what constitutes a seizure "will vary, not
only with the particular police conduct at issue, but also
with the setting in which the conduct occurs").

         ¶58
Sometimes, the circumstances surrounding a person's
encounter with the police "are so intimidating as to
demonstrate that a reasonable, innocent person would not feel
free to decline the officers' requests or otherwise
terminate the

27

encounter." Jackson, 39 P.3d at 1183-84
(setting forth a number of non-exhaustive factors pertinent
to a totality of the circumstances analysis); see also
People v. Heilman, 52 P.3d 224, 228-29 (Colo. 2002)
(finding that "the officer was not seeking [the
defendant's] cooperation and he was not free to
leave"). For instance, the Supreme Court has emphasized
that the "threatening presence of several officers"
can indicate a seizure. United States v. Mendenhall,
446 U.S. 544, 554 (1980). This court has similarly identified
factors relevant to determining whether a person has been
seized, including "the number of officers present . . .
[and] whether an officer's show of authority or exercise
of control over an individual impedes that individual's
ability to terminate the encounter." Marujo,
192 P.3d at 1007 (quoting Jackson, 39 P.3d at 1184).
In some instances, "the 'strong presence of two or
three factors' may be sufficient to support the
conclusion a seizure occurred." United States v.
Lopez, 443 F.3d 1280, 1284-85 (10th Cir. 2006) (quoting
Fuerschbach v. Sw. Airlines Co., 439 F.3d 1197, 1203
(10th Cir. 2006)).

         ¶59
In weighing the Marujo factors, the majority
acknowledges that the presence of more than one officer can
increase the coerciveness of an interaction. Maj. op. ¶
24. However, that was not the case here-according to the
majority-because, it suggests, the presence of eight officers
dressed in tactical gear was so unobtrusive that Ganaway did
not even notice them. Id. at ¶ 32. And because
the majority also determines that none of the other factors
weigh in favor of finding a

28

seizure, it concludes that the encounter was consensual,
meaning it did not trigger Fourth Amendment protections.
Id. at ¶ 35.

         ¶60
I see the encounter very differently.

         ¶61
To begin, there was nothing unobtrusive about the police
presence. The sudden appearance of eight officers in
tactical gear is drastically different from an encounter with
one or two officers. In numerous other cases, the presence of
large numbers of officers have supported the conclusion that
a defendant was seized. For instance, in United States v.
Ward, 961 F.2d 1526, 1533 (10th Cir. 1992), the Tenth
Circuit noted that being "outnumbered by at least two
officers" "support[ed] the conclusion that [the]
defendant was seized" because "the presence of more
than one officer increases the coerciveness of an
encounter." See also United States v. Bloom,
975 F.2d 1447, 1454 (10th Cir. 1992) (concluding that the
presence of multiple officers increased the coerciveness of
the encounter because the defendant was "outnumbered,
and he knew it"); United States v. Glass, 128
F.3d 1398, 1406 (10th Cir. 1997) (stating that the Tenth
Circuit has "considered it significant [when] . . . more
than one officer confronted the subject"); United
States v. Anderson, 663 F.2d 934, 939-40 (9th Cir. 1981)
(holding that the encounter was "clearly a
'seizure'" when the individual was confronted by
"five DEA agents, one LAPD officer, plus four uniformed
Orange County deputy sheriffs").

29

         ¶62
The majority downplays the number of officers present,
suggesting that the eight police officers were so unobtrusive
that "Ganaway did not notice them until he was about
twenty feet away from them." Maj. op. ¶ 32. True,
Ganaway did not notice the officers until they stopped him,
but that is because the officers went to great lengths to
avoid being detected. Why? Because the officers' intended
destination was also room 145. They were there to arrest
Anthony Veloz, who, Detective Foster explained, had "a
high propensity to arm [himself] with handguns."
Veloz's associates did as well, according to the
Detective, and so the officers were concerned for their
safety.

         ¶63
This is why, in the Detective's words, the eight officers
were "creep[ing]" up the side of the motel in a
row. This is also why the officers stopped in their tracks
some six to ten feet from Veloz's motel room when they
saw Ganaway park twenty yards away, exit his car, and
walk-head down-towards Veloz's room. And, finally, this
is why-even though they lacked reasonable suspicion to stop
him-the officers nonetheless stopped Ganaway and then
immediately searched him just before he got to Veloz's
room. The officers didn't know whether Ganaway saw them,
and as Detective Foster testified, they wanted to make sure
he didn't alert Veloz "that law enforcement was,
essentially, stacking up on his front door."

30

         ¶64
Detective Foster's testimony indicates that Ganaway was
not free to continue his day until the officers' tactical
operation-the arrest of Veloz-was completed. As the majority
explains, an individual is seized if they do not "feel
free to decline the officers' requests or otherwise
terminate the encounter." Maj. op. ¶ 17 (quoting
Marujo, 192 P.3d at 1006). And like any reasonable
person under these circumstances, Ganaway did not feel free
to decline the officer's request or terminate the
encounter. This was a seizure.

         ¶65
Of course, the officers' subjective intent-whether they
intended to seize Ganaway-is not relevant unless they
communicated that intent to him. Chesternut, 486
U.S. at 575 n.7. But here, the number, location, and behavior
of the officers communicated volumes. Outlaw, 17
P.3d at 156. And so did Ganaway's behavior. We need only
look to his responses to the stop (his jaw literally dropped)
and to the "request" that he submit to a patdown
search immediately thereafter. He moved to the officers
without, apparently, being asked to do so: first, sticking
his arms out like a scarecrow, then looking over his
shoulder, and slowly walking backwards until he reached the
officers. His was not the behavior of someone who felt free
to deny the officer's request and continue on his way.

         ¶66
Another factor that weighs in favor of finding that Ganaway
was seized is the physical appearance of the eight officers.
United States v. Black, 707 F.3d 531, 538 (4th Cir.
2013) (concluding that the defendant was seized because of
the

31

"collective show of authority by the [seven] uniformed
police officers"). As Detective Foster testified, all
eight officers were dressed in "ballistic vests that had
very large . . . conspicuous police markings." And while
the officers here did not brandish their weapons, a
reasonable person would not necessarily believe that eight
police officers outfitted in tactical vests conspicuously
labeled "POLICE" were unarmed. See Ward,
961 F.2d at 1533 n.6 (relying on United States v.
Grant, 920 F.2d 376, 382 (6th Cir. 1990)).

         ¶67
I consider, as well, the fact that Ganaway was stopped when
no other people were around. "When confronted by
authorities in . . . a public place, a reasonable person is
less likely to feel that he is unable to decline the
agent's request or otherwise terminate the
encounter." United States v. Zapata, 997 F.2d
751, 757 (10th Cir. 1993); see also Ward, 961 F.2d
at 1532 (stating that "in a public setting . . . the
reasonable innocent person is less likely to feel singled out
as the officers' specific target"). But
police-citizen interactions that occur in public places in
the absence of other members of the public can be viewed as a
factor pointing toward a nonconsensual encounter. United
States v. Hernandez, 847 F.3d 1257, 1265 (10th Cir.
2017). Thus, the fact that Ganaway was stopped by
eight officers in tactical vests and immediately searched
when no one else was around, in my view, favors finding a
seizure.

32

         ¶68
Certainly, there are some factors that I regard as neutral or
favoring a consensual encounter. These include the
officers' tone of voice and lack of physical contact. On
balance, however, the totality of the circumstances here
weighs heavily in favor of finding a seizure. The
intimidating nature of the encounter was compounded by the
speed at which it unfolded. Ganaway was alone, the eight
officers were trying to remain out of sight, he did not see
them until they stopped him, and then they immediately
searched him to prevent him from reaching his intended
destination, which happened to be the officers' intended
destination as well. See Jones, 154 A.3d at 596
(concluding that the "circumstances are more
intimidating if the person is by himself, if more than one
officer is present, or if the encounter occurs in a location
that is secluded or out of public sight"). Even if
Ganaway could, in theory, have walked by the officers,
"the greater number of officers and their positioning
created an intimidating environment that psychologically, if
not physically, 'substantially reduced' the ease with
which [he] could have avoided the police."
Dozier, 220 A.3d at 945-46 (quoting Jones,
154 A.3d at 597). That is, the officers exercised their
authority in a manner which made it apparent to Ganaway that
he was not free to ignore them and proceed on his way.

         III.
Conclusion

         ¶69
Because the officers seized Ganaway without reasonable
suspicion to do so, I would affirm the district court's
suppression order.

---------

Notes:

[1] The record is unclear as to whether
there were seven or eight officers present. For the purposes
of this opinion, we assume that there were eight.

[2] The People properly certified this
appeal "is not taken for the purpose of delay" and
"the evidence is a substantial part of the proof of the
charge pending against the defendant," pursuant to
section 16-12-102(2), C.R.S. (2024).

[3] Detective Foster testified when
discussing the subsequent patdown, "[W]e were, kind of,
in like a line, and I stepped out to my right and just waited
for [Ganaway] to back up to me."

[4] Additionally, the subjective
suspicions of the police and why they ask a question are
irrelevant to the seizure analysis unless the
"officer's subjective intent in approaching the
individual is communicated to that individual."
People v. Melton, 910 P.2d 672, 677 (Colo. 1996)
(citing Mendenhall, 446 U.S. at 554 n.6). In this
case, the police did not communicate their reasons for
engaging Ganaway to him.

[5] The suppression hearing testimony
explains that all the patrol cars were parked south of the
officers. The exit to the parking lot was north of Ganaway
and his vehicle.

[6] Though the exit path here was
perfectly clear, it need not be for the encounter to be
consensual. See People v. Cascio, 932 P.2d 1381,
1387-88 (Colo. 1997) (finding a consensual encounter when the
defendants would have needed to maneuver their car in a
manner similar to parallel parking in order to exit).

[7] The officers did not request that
Ganaway approach in this manner. Additionally, Detective
Foster testified that having someone put their arms out to
the side for a patdown is not his normal practice.

---------